UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DARYL R. PRINDLE,

                        Plaintiff,

                                                            3:15-CV-1481
v.                                                          (GTS/DEP)

CITY OF NORWICH;
CITY OF NORWICH FIRE DEPARTMENT;
TRACY L. CHAWGO; and
DEBORAH DeFOREST,

                        Defendants.
_____

APPEARANCES:                               OF COUNSEL:

LEVINE & BLIT, PLLC                        LEWIS G. SPICER, ESQ.
  Counsel for Plaintiff
499 South Warren Street, Suite 500B
Syracuse, NY 13202

MACKENZIE HUGHES, LLP                      CHRISTIAN  P. JONES, ESQ.
  Counsel for Defendants
101 South Salina Street, Suite 600
Syracuse, NY 13202

GLENN T. SUDDABY, Chief United States District Judge

## <u>**DECISION and ORDER**</u>

Currently before the Court, in this employment discrimination action filed by Daryl R.

Prindle ("Plaintiff") against the City of Norwich, City of Norwich Fire Department, Tracy L.

Chawgo, and Deborah DeForest ("Defendants"), is Defendants' motion for summary judgment.

(Dkt. No. 33.)  For the reasons set forth below, Defendant's motion is granted in part and denied

in part, and Plaintiff's Complaint is dismissed in part.

## I.    BACKGROUND

### A.    Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint alleges that on or about February 2014 through November 2014, Defendants violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA") and the New York State Human Rights Law, N.Y. Exec. Law § 291 ("NYSHRL") by, *inter alia*, (1) terminating him on the basis of his disability (post-traumatic stress disorder), (2) retaliating against him for filing a union grievance against the city, (3) subjecting him to a hostile work environment, and (4) failing to provide him with a reasonable accommodation for his disability.  (Dkt. No. 1 [Plf.'s Compl.].)  Further familiarity with these claims and the factual allegations supporting them in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties.  As relief, the Complaint requests, *inter alia*, (1) an award of back and front pay, (2) damages to compensate Plaintiff for emotional distress and mental anguish, and (3) injunctive relief (presumably including possible reinstatement).  (*Id*.)

### B.    Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and expressly admitted by Plaintiff in his response thereto or denied without appropriate record citations.  (*Compare* Dkt. No. 33, Attach. 21 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 37, Attach 1 [Plf.'s Rule 7.1 Resp.].)

1.    The City of Norwich Fire Department employs fifteen full-time Firefighters on a regular basis, in addition to approximately four to seven Fire Assistants.  Both the full-time

Firefighters and the Fire Assistants are represented by the City of Norwich Fire Fighters Association ("Union"). The Union and the City of Norwich are parties to a Collective Bargaining Agreement ("CBA"), which governs the terms and conditions of employment for the full-time Firefighters and the Fire Assistants.

2.      The Firefighters work a regular, full-time schedule on a weekly basis. The Fire Assistants are used on a per diem, as-needed basis. As a result, they generally do not work a regular schedule, but are primarily used to fill in on occasions where there is an open shift or a full-time Firefighter is on vacation.[1] This may result, and has resulted, in a Fire Assistant maxing out on his yearly hours (1,248 hours).

3.      As of April 24, 2007, the City of Norwich Civil Service Job Description for the full-time Firefighter position required that all full-time Firefighters for the Fire Department possess a New York State Advanced Emergency Medical Technician, or an Advanced Life Support ("ALS"), certification.

---

[1]      In this portion of his Rule 7.1 Response, Plaintiff attempted to is dispute what he perceived to be an implication of Defendants' factual assertion. Plaintiff is respectfully reminded that a Rule 7.1 Response is not the means by which to dispute a possibly implied fact but the means by which to dispute an expressly asserted fact. *See* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's responses shall . . . admit[] and/or deny[] each of the movant's assertions in matching numbered paragraphs.") (emphasis added); *see, e.g., Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts); *cf. Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make"). To the extent that a non-movant desires to set forth any additional material facts that he contends are in dispute, he or she is required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs.

4.     Once an individual obtains his or her initial ALS certification, the individual must then re-certify every three years to maintain the certification.

5.     An individual can complete the re-certification in one of three manners; the first manner is through participation in a re-certification course that combines "hands-on" training and testing combined with a written examination.  Re-certification through this method is offered once per year in Chenango County and typically takes six to eight months to complete.

6.     The second manner in which ALS re-certification can be obtained is through participation in an online Continuing Medical Education ("CME") program. This program is available to qualified employees of an agency registered in the CME program. As of March 2013, re-certification through the CME program could be completed entirely online over the course of three years.  Under this method, an individual must be employed by a registered agency and

remain in "continuous practice" in order to re-certify.

7.     The City of Norwich Fire Department was a registered agency in the CME program in 2014.

8.     The third manner in which ALS re-certification can be obtained is a "challenger course," which involves hands-on training followed by a written test and usually takes two to three months to complete.

9.     Although this may not have been Plaintiff's understanding between April and July 2014, at that time there was no requirement that an individual be an "on-duty" employee to complete re-certification through the traditional "hands-on" method.  In fact, there is no requirement that an individual be employed at all.

4

10.     With respect to the second method, an individual must be employed by a registered agency to re-certify.  However, under the applicable regulation, it appears possible that an employee on a medical leave of absence may be able to re-certify through the second method (depending on the opinion of the New York State Department of Health).[2]

11.     Plaintiff was hired by the City of Norwich as a part-time Fire Assistant on or about April 26, 2007. On or about February 20, 2008, Plaintiff was appointed as a full-time firefighter for the Fire Department.

12.     On December 7, 2008, Plaintiff participated in the rescue of a severely injured victim from a fire.

13.     In late February 2014, the Union requested a meeting to discuss a safety concern involving one of the Firefighters.

14.     The meeting was held on February 27, 2014. Fire Chief Tracy Chawgo, former Mayor Joseph Maiurano and Human Resources Director Deborah DeForest attended the meeting on behalf of the City.

15.     At the meeting, the Union representatives explained that one of the Firefighters had been acting out of sorts, including bumping into walls, having pinpoint pupils, and engaging

---

[2]     In this portion of his Rule 7.1 Response, Plaintiff made a blanket denial of all of the facts in the corresponding paragraph of Defendants' Rule 7.1 Statement but cited a portion of the record that disputed only one of the facts asserted by Defendants, in violation of the District's Local Rules of Practice.  N.D.N.Y. L.R. 7.1(a)(3).  *See also Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiff's S.D.N.Y. Local Rule 56.1 statement but declined to provide record citations in support); *cf. N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations").

in odd behaviors that made them suspect that he might be using drugs.  After initially refusing to

name the Firefighter, the Union representatives eventually revealed that Plaintiff was the

Firefighter at issue.[3]

16.     The next day, Plaintiff informed Ms. DeForest that he was taking a leave of

absence.  He simultaneously filed a Workers' Compensation claim and an application for

benefits pursuant to General Municipal Law Section 207-a ("Section 207-a"), alleging that he

was suffering from post-traumatic stress disorder ("PTSD") as a result of the December 7, 2008

event.

17.     Once Mr. Plaintiff went out on his leave of absence, the City decided that he

would need to be examined by a PTSD specialist before the City would return him to work.

This decision was made due to the inherent dangers involved with the duties of a Firefighter,

together with the safety concerns expressed by the other City Firefighters related to Plaintiff

and the nature of PTSD.[4]

---

[3]     Although Mr. Gray testified that he did not recall whether drug use was
mentioned at the meeting or not, this is insufficient to support a denial.  *See F.D.I.C. v. Nat'l
Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and
memory lapses . . . do not create genuine issues of material fact."); *Genger v. Genger*, 663 F.
App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no
recollection" of a fact "does not constitute a denial"); *Davis v. City of Syracuse*, 12-CV-0276,
2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("On a motion for summary
judgment, denials of fact that are based on a lack of personal knowledge, mere information or
belief, and/or inadmissible evidence are insufficient to create a genuine dispute."); *In re
Horowitz*, 14-CV-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) (stating
that, "[o]n a motion for summary judgment, denials based on a lack of knowledge or information
sufficient to form a belief are insufficient to contest a disputed fact . . . . Similarly, a response
contending to neither admit or deny an allegation does not create a genuine issue of fact");
*accord, Piacente v. Int'l Union of Bricklayers & Allied Craftworkers*, 11-CV-1458, 2015 WL
5730095, at *2 n.3 (S.D.N.Y. Sept. 30, 2015).

[4]     *See*, *supra*, note 1 of this Decision and Order.  The Court notes further that
Defendants made no assertion about precisely when the City made this determination or if it had
been prompted by the decision of Plaintiff's physician.

18.    Pursuant to Section 207-a, a municipality has the right to perform a medical examination of an employee to determine whether the employee is able to perform his job duties.

19.    As required by Section 207-a, Defendants had Plaintiff sign the appropriate medical release forms in order to determine whether he was eligible for Section 207-a benefits. The release forms were forwarded to the treatment professionals with whom Plaintiff had been treating.

20.    Plaintiff's treatment professionals were slow in providing Defendants with the required records. On or about March 24, 2014, Dr. Vogel advised DeForest that he had "lost" Plaintiff's medical records. In addition, Plaintiff's psychiatrist, Dr. Jerry Duvinsky, M.D., notified Defendants in April 2014 that he would not release the medical records without a waiver by Plaintiff. Dr. Duvinsky obtained the waiver from Plaintiff on or about late April 2014.

21.    Pending receipt of these records, Defendants could neither schedule Plaintiff for an independent medical exam with a PTSD specialist, nor act on Plaintiff's application for Section 207-a benefits.

22.    In or about late April 2014, Ms. DeForest received correspondence from Dr. Duvinsky stating as follows:

> Upon consultation with my patient earlier today, it is mutually agreed that he attempt to return to employment in two weeks from this date. This will give him more time to benefit from psychotherapy and changes in medication management routines. It is my recommendation that he be considered to commence on "light duty" for the first two weeks. This could, for example, consist of 12 hour shifts every other day before resuming his full workload. Such a schedule would allow full exposure to the various areas of his occupational responsibilities, while at the same time allowing for some time to assimilate the experiences.

23.     Ms. DeForest forwarded the correspondence to Chief Chawgo. Following the review of Dr. Duvinsky's letter, Ms. DeForest and Chief Chawgo telephoned Dr. Duvinsky to gather more clarification on Plaintiff's status.  Dr. Duvinsky explained that he was requesting that Plaintiff be provided 12-hour shifts so that he could be eased back into the job and to provide a means for assessing how Plaintiff reacted to different situations that may arise while on duty.

24.     After Ms. DeForest and Chief Chawgo spoke to Dr. Duvinsky, Ms. DeForest discussed the issue with Mayor Maiurano, and they determined that Plaintiff could not be returned to work at that time.

25.     The Union did not file a grievance related to this determination.

26.     On or about May 9, 2014, Ms. DeForest received further correspondence from Dr. Duvinsky, this time stating that Plaintiff could return to work without restriction.

27.     Ms. DeForest discussed the Duvinsky letter of May 9, 2014, with Chief Chawgo and Mayor Maiurano. At that point, Defendants were still in the process of scheduling Plaintiff for an examination by Dr. McIntyre, who specializes in the treatment of fire personnel diagnosed with PTSD.[5]

28.     The Union thereafter filed a grievance, asserting that Defendants should have put Plaintiff back to work once his doctor cleared him without restrictions.

29.     The City informed the Union that it was requiring that Plaintiff be examined by its own PTSD specialist, wherein the examination had initially been delayed due mostly to the

--------

[5]          *See*, *supra*, note 1 of this Decision and Order.

difficulties in obtaining Plaintiff's medical records.[6]  The Union did not pursue the grievance any further.

30.    Sometime thereafter, Chief Chawgo became aware that the ALS certifications of two firefighters, including Plaintiff, were set to expire at the end of July.  Chief Chawgo sent a text message to Plaintiff on July 16, 2014, directing him to provide the required updated certification. He followed up with a letter to Plaintiff dated July 28, 2014.

31.    On July 29, 2014, Chief Chawgo was notified that Plaintiff had appeared at the fire station in a disoriented state while bleeding profusely from his right hand. He was taken to the emergency room where he received 36 stitches to close the lacerations. Chief Chawgo visited Plaintiff at the hospital and Plaintiff told him that the injuries were caused by punching a tree and mirror.

32.    On or about July 29 or July 30, 2014, Chief Chawgo informed Ms. DeForest of the incident of July 29, 2014, involving Plaintiff.[7]

33.    Plaintiff was examined by Dr. McIntyre on or about July 8, 2014.  Around the first week of August 2014, Dr. McIntyre provided Defendants with his Independent Medical Evaluation ("IME") report, dated August 1, 2014, wherein he opined that Plaintiff was indeed suffering from PTSD related to the fire of December 7, 2008, but that he was now fit to return to duty.

---

[6]    *See*, *supra*, note 1 of this Decision and Order.

[7]    *See*, *supra*, note 1 of this Decision and Order.  The Court notes further that, to the extent that Plaintiff intended to deny any fact in the above-stated paragraph, he neither did so expressly nor cited any supporting record evidence, in violation of Local Rule 7.1 of the District's Local Rules of Practice.

34.     Upon receiving that independent medical report, Defendants contacted Dr. McIntyre to advise him of Plaintiff's behavior on July 29, 2014. Dr. McIntyre advised Defendants that, before clearing Plaintiff to return to work, he would like to review the medical records regarding that incident as well as any updated records from Dr. Duvinsky.

35.     On September 3, 2014, Defendants sent Plaintiff a letter stating that the updated medical records were needed. Thereafter, on or about September 8, 2014, the updated medical records from Dr. Duvinsky and a partial report from the hospital were received.

36.     The medical records were forwarded to Dr. McIntyre. Thereafter, in or about late September 2014, Ms. DeForest received correspondence from Dr. McIntyre indicating that he saw no reason for further examination and remained of the opinion that Plaintiff could return to work.

37.     In late September 2014, Ms. DeForest was made aware through the New York State License Event Notification System ("LENS") that Plaintiff's license had been suspended. Ms. DeForest informed Chief Chawgo of this fact.

38.     On October 7, 2014, the Common Council discussed the status of Plaintiff's Section 207-a application and made the determination that the various medical reports supported the approval of the application and his return to work.

39.     The next day, Defendants sent Plaintiff a letter notifying him that his Section 207-a application had been approved and advising him that Chief Chawgo would be contacting him regarding his return to work.

40.     On October 9, 2014, Chief Chawgo advised Plaintiff by letter that it had come to Defendants' attention that he no longer possessed a valid New York State Driver's License or ALS certification.

10

41.     Plaintiff was directed to appear at a meeting scheduled for October 22, 2014, at which he would have the opportunity to produce any evidence and/or information regarding the status of his Driver's License and ALS certification. He was also advised that he could have a Union representative and/or counsel of his own choosing present at the meeting.

42.     Plaintiff attended the October 22, 2014, meeting with his union representative. Also in attendance were Chief Chawgo and the City's employment counsel, Brian Kremer, of the Goldberger & Kremer law firm. At the meeting, Plaintiff admitted that his New York State Driver's License had been suspended and that he did not possess a valid ALS certification.

43.     Following the meeting, the Mayor and City Council were informed that Plaintiff did not possess a valid driver's license or the required ALS certification.

44.     The Common Council meeting was scheduled for October 29, 2014.  At the meeting, the council passed a Resolution terminating Plaintiff's employment effective November 1, 2014, for failure to maintain the minimum qualifications for the Firefighter position.

45.     A letter dated October 30, 2014, was thereafter sent to Plaintiff advising him of the Common Council's decision.

46.     Following his termination, Plaintiff did not obtain his ALS certification, nor did he seek any paid Firefighter or EMT positions with any other municipality.[8]

47.     In March 2015, Plaintiff accepted a Customer Service position at Lowe's, which paid him $12.22 per hour.

48.     The Union did not file a grievance or otherwise challenge Plaintiff's termination.

---

[8]     *See*, *supra*, note 1 of this Decision and Order.

49.     Ms. DeForest is the Director of Human Resources for the City of Norwich.  She reports to the Mayor and the Common Council. She does not possess the sole authority to hire or fire employees.

50.     Throughout Plaintiff's leave of absence, Ms. DeForest regularly kept the Common Council and the Mayor informed as to Plaintiff's status. She did this primarily during executive sessions at the bi-monthly City Council meetings.[9]

51.     Mr. Chawgo is the Fire Chief for the City of Norwich Fire Department. He reports to the Mayor and the Common Council. Although he has the authority to discipline employees, he does not have the sole authority to hire and fire employees.

**C.     Parties' Briefing of Defendants' Motion**

**1.     Defendants' Memorandum of Law**

Generally, in support of their motion for summary judgment, Defendants argue as follows: (1) Plaintiff's disability discrimination claim should be dismissed because (a) the City of Norwich acted lawfully when it imposed an additional medical examination requirement before returning him to work, (b) Plaintiff fails to establish that he is "disabled" under the ADA and NYSHRL, (c) Plaintiff fails to establish that he met the minimum qualifications required for the firefighter position, and (d) Plaintiff is unable to meet his burden of proving Defendants' reasons for terminating his employment were pretextual; (2) Plaintiff's retaliation claims should be dismissed because he offers no evidence supporting a causal connection between the union

---

[9]     *See*, *supra*, notes 1 and 3 of this Decision and Order.  The Court notes further that, in response to this asserted fact, Plaintiff cites deposition testimony regarding merely Plaintiff's "return to work" and "employment," but not his "status" in particular.

grievance and Defendants' decision to terminate his employment; (3) Plaintiff's hostile work environment claims should be dismissed because he fails to offer evidence establishing severe or pervasive behavior as required under the ADA and NYSHRL; (4) Plaintiff's reasonable accommodation claim should be dismissed because no reasonable accommodations existed under the circumstances; (5) the totality of the ADA claims against Mr. Chawgo and Ms. DeForest individually should be dismissed because individual liability is not recognized under the ADA; and (6) the totality of the NYSHRL claims against Mr. Chawgo and Ms. DeForest should be dismissed because those individuals lacked the authority to make termination decisions.  (*See generally* Dkt. No. 33, Attach. 22 [Defs.' Memo. of Law].)

In the alternative, Defendants argue that Plaintiff's claims for award of back pay and front pay should be precluded because he failed to mitigate his damages when he made no reasonable efforts to obtain comparable employment after his termination.  (*Id.*)

### 2.    Plaintiff's Opposition Memorandum of Law

Generally, in Plaintiff's response to Defendants' motion for summary judgment, he argues as follows: (1) the record evidence is sufficient to establish a prima facie case of discrimination as required by the ADA and NYSHRL because (a) he is disabled within the scope of the ADA and NYSHRL, (b) he was qualified for the position both before and after his disability, and (c) genuine issues of material fact exist as to whether Defendants' actions were a pretext to mask discrimination as a result of disparate treatment given to other employees; (2) his failure-to-accommodate claim should proceed because Defendants did not engage in the interactive process as required by the ADA and NYSHRL; (3) sufficient evidence exists to support an inference of retaliation because Plaintiff was denied several opportunities to engage

in work-related activities after being cleared for duty; (4) sufficient evidence exists to support an inference of a hostile work environment because issues between Mr. Chawgo and Plaintiff arose only after Plaintiff was diagnosed with PTSD and required a leave of absence; (5) Chief Chawgo and Ms. DeForest are subject to individual liability under the NYSHRL; and (6) a triable issue of material fact remains as to whether Plaintiff failed in his duty to mitigate damages in finding comparable employment because Defendants employ the only paid firefighters in Chenango County.  (*See generally* Dkt. No. 37 [Plf.'s Opp'n Memo. of Law].)

### 3.    Defendants' Reply Memorandum of Law

Generally, in their reply, Defendants argue as follows: (1) Plaintiff was not qualified for the firefighter position at the time of his termination because the job qualification records he has provided were out-of-date and there is no dispute that he did not possess a valid driver's license at the time of his termination; (2) in addition, Plaintiff cannot meet his burden to establish an inference of unlawful discrimination because the employees cited by Plaintiff in support of his disparate treatment argument were not similarly situated; (3) Plaintiff cannot establish that his failure to remain qualified as a basis for termination was a pretext for discrimination because he was reminded for three months prior to his lapse that his certifications were about to expire; (4) no obligation to accommodate Plaintiff existed because he had multiple opportunities and ways to re-certify that did not require his return to active status prior to his lapse; and (5) no triable issues of material fact exist as to whether Plaintiff failed to mitigate his damages because his own testimony reveals that he made no efforts to obtain substantially equivalent employment. (*See generally* Dkt. No. 39 [Defs.' Reply Memo. of Law].)

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[10] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e). Although this Court recognizes some caution in awarding summary judgment in discrimination actions because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions",

---

[10]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

summary judgment nonetheless remains available in discrimination cases lacking genuine issues of material fact. *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d. Cir. 2006), quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[11]  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[12]

------

[11]    *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[12]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[13]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

**B.     Legal Standard Governing Plaintiff's Claims**

**1.     42 U.S.C. § 12101 (Americans with Disabilities Act)**

**a.     Discrimination Claim**

The ADA prohibits covered entities from discriminating against qualified individuals on the basis of disability.  42 U.S.C. § 12112(a) (2008).  In the context of discriminatory termination, a plaintiff must establish, by a preponderance of the evidence, a prima facie case

---

[13]     *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

showing "(1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances surrounding that action giving rise to an inference of discrimination." *Welsh v. Rome Mem'l Hosp., Inc.*, 14-CV-1423, 2016 U.S. Dist. LEXIS 154635 at *7-8 (N.D.N.Y. Nov. 8, 2016) (quoting *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)).  In what has become known as the *McDonnell-Douglas* burden-shifting framework, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision.  After the employer has done so, the burden then shifts back to the plaintiff to demonstrate that the defendant's reason for its adverse decision is in fact a pretext for discrimination.  *Welsh*, 2016 U.S. Dist. LEXIS 154635, at *8.  "In the summary judgment context, this means plaintiff must 'establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for discharging [him] is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.'"  *Id*. (*citing*, *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994)).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A) (2008).  "Major life activities are generally those activities that are of central importance to daily life."  *Cody v. Cty. of Nassau*, 577 F. Supp. 2d 623, 638 (E.D.N.Y. 2008).  Major life activities under the ADA include, but are not limited to, caring for oneself, eating, sleeping, concentrating, thinking, working, and neurological functions.  42 U.S.C. § 12102(2)(A)-(B).  "To constitute a disability, an impairment must not merely affect a major life activity, it must substantially limit that activity."  *Id.*  "Thus a plaintiff who showed that . . . he had an impairment and that the impairment affected a major life

18

activity would nonetheless be ineligible to prevail under the ADA if the limitation of the major

life activity was not substantial." *Id.* (internal quotation marks omitted).  The EEOC regulations

provide that an impairment, whether physical or mental, 'substantially limits' a major life

activity where an individual is

> (i) Unable to perform a major life activity that the average person
> in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration
> under which an individual can perform a particular major life
> activity as compared to the condition, manner, or duration under
> which the average person in the general population can perform
> that same major life activity.

*Id.* (citing 29 C.F.R. § 1630.2(j)[1]).  The definition of disability under the ADA "shall be

construed in favor of broad coverage of individuals under [the] Act, to the maximum extent

permitted by the terms of [the] Act."  42 U.S.C. § 12102(4)(A).

In order for an individual to be "qualified" for a position, he or she must be able to

"perform the essential functions of the employment position that such individual holds or

desires."  42 U.S.C. § 12111(8)  "[C]onsideration shall be given to the employer's judgment as

to what functions of a job are essential, and if an employer has prepared a written description

before advertising or interviewing applicants for the job, this description shall be considered

evidence of the essential functions of the job."   42 U.S.C. § 12111(8).

### b.    Retaliation Claim

The ADA makes it unlawful for an employer to "coerce, intimidate, threaten, or interfere

with any individual in the exercise or enjoyment of . . . any right granted or protected by this

chapter."  42 U.S.C. § 12203(b).  The ADA further renders it unlawful for an employer to

"discriminate against any individual because such individual has opposed any act or practice

made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

To defeat a motion for summary judgment in the context of a retaliation claim under the ADA, a plaintiff must establish a prima facie case showing that "(1) he engaged in protected participation or opposition under the ADA; (2) that the employer was aware of this activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action." *Skinner v. City of Amsterdam*, 824 F. Supp. 2d 317, 329 (N.D.N.Y. 2010). In a fashion similar to the *McDonnell-Douglas* framework, a defendant must then point to evidence of a legitimate, non-retaliatory reason for the decision. If satisfied, the burden then shifts back to the plaintiff to point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is in fact a pretext for impermissible retaliation. *Skinner*, 824 F. Supp. 2d at 329.

### c.    Hostile Work Environment Claim

The Second Circuit has not yet decided whether hostile work environment claims are cognizable under the ADA. *Dollinger v. N.Y. State Ins. Fund*, No. 16-4068-CV, 2018 U.S. App. LEXIS 3303 at *5 (2d Cir. Feb. 13, 2018). Assuming such claims are cognizable under the ADA, a plaintiff can prevail on a hostile work environment claim only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted).

20

The workplace must be evaluated "on the totality of the circumstances," and the Court can consider factors including the following: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it is unreasonably interferes with an employee's work performance." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767-68 (2d Cir. 1998) (quoting *Harris*, 510 U.S. at 23). Hostile work environment claims, however, "are meant to protect individuals from abuse and trauma that is severe" and "are not intended to promote or enforce civility, gentility, or even decency." *Curtis v. DiMaio*, 46 F. Supp.2d 206, 213-14 (E.D.N.Y. 1999), *aff'd*, 205 F.3d 1322 (2d Cir. 2000).

### d.    Reasonable Accommodation Claim

The ADA imposes liability on employers for, *inter alia*, failing to make "reasonable accommodations to the known physical or mental limitation of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5).  A plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009). The burden of both production and persuasion as to the existence of some accommodation that would allow him to perform the essential functions of his employment lies with the plaintiff.

*McBride*, 583 F.3d at 97.  Although "essential functions" is not explicitly defined by the ADA, regulations promulgated by the Equal Employment Opportunity Commission ('EEOC') indicate that it encompasses "the fundamental job duties of the employment position."  29 C.F.R. § 1630.2(n)(1).

Under the express terms of the ADA, the term "reasonable accommodation" includes "job restructuring" and "part-time or modified work schedules."  42 U.S.C. § 12111(9).  "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."  *McBride*, 583 F.3d at 99 (quoting *Jackan v. N.Y. State DOL*, 205 F.3d 562, 566 (2d Cir. 2000)); *see also* 29 C.F.R. § 1630.2(o)(3).  Failure to engage in this interactive process does not automatically produce liability for employers if no reasonable accommodation is possible.  *McBride*, 583 F.3d at 100.  "[A]n employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless [he] also establishes that, at least with the aid of some identified accommodation, [he] was qualified for the position at issue."  *Id.* at 101.

### 2.    N.Y. Exec. Law § 291 (NYSHRL)

#### a.    Discrimination Claim

The NYSHRL prohibits employers from discrimination on the basis on "age, race, creed, color, national origin, sexual orientation, military status, marital status, or disability . . . ."  N.Y. Exec. Law § 291 (2018).   The NYSHRL defines a disability as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted

clinical or laboratory diagnostic techniques." N.Y. Exec. Law §§ 292(21), 296(1)(a). The elements of a discrimination claim under the NYSHRL are generally the same as those under the ADA, with one key difference: the NYSHRL has a broader definition of disability than does the ADA and does not require any showing that the disability substantially limits a major life activity. *Ugactz v. UPS, Inc.*, 10-CV-1247, 2013 WL 1232355, at *52 (E.D.N.Y. Mar. 26, 2013); *see also Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 198 (E.D.N.Y. 2012) (noting that the NYSHRL is not a "carbon copy of the ADA" and that NYCHRL provisions are "'more liberally' [construed] than their federal and state counterparts").

Employment discrimination claims brought under the NYSHRL are also analyzed under the *McDonnell-Douglas* burden shifting framework set out by the U.S. Supreme Court. *Sims v. Tr. of Columbia Univ. in the City of N.Y.*, No. 156566/2013, 2017 N.Y. Misc. LEXIS 4204, at *11 (N.Y. Sup. Ct., Nov. 1, 2017). *See, supra,* Part II.B.1.a. of this Decision and Order for a detailed discussion of the requirements imposed by *McDonnell-Douglas*.

### b.     Retaliation Claim

The NYSHRL makes it unlawful for an employer to retaliate against any employee that engaged in a protected activity. *See generally* N.Y. Exec. Law § 296(7). On a motion for summary judgment, retaliation claims under the NYSHRL are analyzed under the same standard as the ADA. *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (applying *McDonnell-Douglas* analysis to employment discrimination claims under NYSHRL). For the purpose of brevity, the Court will not recite that standard in its entirety in this Decision and Order but will respectfully direct the reader's attention to Part II.B.1.b. of this Decision and Order.

### c.    Hostile Work Environment Claim

Hostile work environment claims under the NYSHRL operate in the same fashion as those brought under federal law.  *See*, *supra*. Part II.B.1.c. of this Decision and Order for a detailed discussion of Plaintiff's burden.

### d.    Reasonable Accommodation Claim

As does the ADA, the NYSHRL makes it unlawful for an "employer . . . to refuse to provide reasonable accommodations to the known disabilities . . . of an employee, prospective employee, or member in connection with a job or occupation sought or held or participation in a training program."  N.Y. Exec. Law § 296(3)(a).  Reasonable accommodations are defined as "actions taken which permit an employee, prospective employee or member with a disability . . . to perform in a reasonable manner the activities involved in the job or occupation sought or held," provided that the requested accommodation does not "impose an undue hardship on the business, program or enterprise of the entity from which action is requested."  N.Y. Exec. Law § 292(21-e).

In another departure from federal ADA standards, an employer's failure to engage in a good-faith interactive process regarding the reasonableness of an employee's requested accommodation generally precludes the employer from obtaining summary judgment.  However, "the plaintiff still bears the burden of proving the existence of a reasonable accommodation that would have enabled the employee to perform the essential functions of his or her position."  *Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 838 (2014).

III.     **ANALYSIS**

   A.     **Claims Under the ADA**

        1.     **Discriminatory Termination Claim**

   After carefully considering the matter, the Court denies Defendants' motion for summary

judgment on Plaintiff's discriminatory termination claim.  As stated above in Part I.C. of this

Decision and Order, Defendants seek dismissal of this claim because (1) the City of Norwich

acted lawfully when it imposed an additional medical examination requirement before returning

Plaintiff to work, (2) Plaintiff fails to establish that he is "disabled" as required under the ADA,

(3) Plaintiff failed to meet the minimum qualifications required for the firefighter position and

was therefore not "qualified" for purposes of the ADA, and (4) Plaintiff is unable to meet his

burden of proving Defendants' reasons for terminating his employment were pretextual.  Based

on the current record, the Court disagrees.

   The parties do not dispute that Plaintiff was subject to an adverse employment action,

given that he was terminated by Defendants on October 30, 2014.  The analysis thus centers on

whether Plaintiff can establish (a) membership in a protected class by showing that he is within

the meaning of "disabled" under the ADA, (b) qualification for the position, and (c)

circumstances surrounding the adverse employment action giving rise to an inference of

discrimination.

        a.     **Whether Plaintiff Was Disabled Under the ADA**

   For ease of analysis, the Court will begin by addressing Defendants' second argument

(described above).  As stated previously, a disability under the ADA is defined as "a physical or

mental impairment that substantially limits one or more major life activities."  42 U.S.C. §

12102(1)(A).  In 2008, Congress amended the ADA in order to expand the definition of

"disabled" and broaden the coverage of persons under the Act.  This expansion was partially in

response to the Supreme Court's decisions in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471

(1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002). *See also* Pub. L.

110-325, § 4(a), Sept. 25, 2008, 122 Stat. 3553; 42 U.S.C.A. §§ 12102(4)(D) & (E).  As a result,

a less restrictive standard was applied to what constitutes a "substantial limitation" to a major

life activity.

In the present case, Plaintiff has sufficiently shown that, during the time in question, he

suffered from PTSD.  (*See generally* Dkt. No. 1 [Plf.'s Compl.].)  This is substantiated by the

confirmation of this condition by Dr. McIntyre.  (*See generally* Dkt. No. 33, Attach. 7.)  Plaintiff

has also sufficiently shown that his PTSD substantially limited various of his major life activities

(specifically, sleeping and neurological functions), as required by 42 U.S.C. § 12102(2)(A)-(B).

(Dkt. No. 33, Attach 17, at 25, ¶¶ 20-24 [Plf.'s Depo. Tr.].)  Based on the findings and diagnoses

of multiple doctors included in the record, the Court finds that Plaintiff has made a sufficient

showing that he is "disabled" as defined under the ADA.

>          **b.       Whether Plaintiff Was Qualified Under the ADA**

Defendants contend, and Plaintiff does not dispute, that his ALS certification had expired

before his termination.  Therefore, Defendants argue, Plaintiff cannot demonstrate qualification

for the position as required by ADA and has failed to establish a prima facie case for

discrimination.  Under ordinary circumstances, this would be fatal to Plaintiff's claim.  However,

the Court finds that the circumstances that give rise to the inference of discriminatory intent–the

fourth element of Plaintiff's prima facie case–are inextricably linked to the reasons that his ALS

certification expired.  Put another way, Plaintiff's lapse in certification is largely rooted in those circumstances that give rise to an inference of discriminatory animus.  Plaintiff argues that, because of this fact, the Court should find that he has sufficiently established this element of a prima face case of discrimination.  The Court agrees.

Plaintiff testified that his primary reason for failing to renew his ALS certification was because Ms. DeForest told him that he could not re-certify any of his requirements while he was on medical leave. (Dkt. No. 33, Attach. 17 at 63, at ¶¶ 14-20 [Plf.'s Depo. Tr.].)  Ms. DeForest maintains that this conversation never occurred.  (Dkt. No. 33, Attach. 1, at ¶ 32 [DeForest Aff.].)  Defendants further argue that this issue is immaterial because Plaintiff later admitted that he did not have the aforementioned conversation with Ms. DeForest.  After reviewing the record, the Court rejects Defendants' argument and finds that Plaintiff did not later admit to the nonoccurrence of this conversation.  Rather, Plaintiff admitted merely that he had no conversations with Ms. DeForest regarding ALS certification specifically, but that he still discussed his training generally.  (Dkt. No, 33, Attach. 17 at 87-88 [Plf.'s Depo. Tr.].)  As a result, a genuine dispute of material fact exists as to whether this conversation occurred and whether Plaintiff failed to pursue re-certification on those grounds.

Another factual dispute regarding whether Plaintiff was able to re-certify while on medical leave is created by the portion of the record indicating that a firefighter seeking re-certification must be in "continuous practice" (in order to register and complete the CME program).  (Dkt. No. 33, Attach. 18 at 35-37 [Chawgo Dep. Tr.].)  Neither party adduces evidence of the exact definition of "continuous practice."  Chief Chawgo stated that he believes the term to mean in continuous employment and on active service in the department.  (*Id.*)

However, he expressed uncertainty about that belief and rendered it contingent upon a review by the New York State Department of Health.

To further support his argument that circumstances to a discriminatory animus are tied to his ALS certification lapse, Plaintiff points to evidence that firefighters in the past (who did not suffer from PTSD) were given the opportunity to renew their qualifications before termination. (Dkt. No. 33, Attach. 20 at 43-44 [Gray Depo. Tr.].) This evidence lends at least some credence to Plaintiff's argument that Defendants' discriminatory animus may have contributed at least in part to the cause of the lapse.

As a secondary argument for why Plaintiff was not qualified, Defendants cite Plaintiff's failure to present a valid driver's license. However, Plaintiff maintains that he received a restricted-use driver's license from New York State that allowed him to drive to and from work and as needed while on the job. (Dkt. No. 33, Attach. 17 at 80, at ¶¶ 4-23 [Plf.'s Depo. Tr.].) Defendants fail to adequately dispute or address this testimony.[14] For these reasons, the Court finds Defendants' secondary argument unpersuasive.

Of course, this decision is not meant to diminish the standard for qualification in a summary judgment context. Rather, this decision addresses the narrow circumstance presented in a case where the plaintiff has adduced sufficient evidence for discriminatory animus as the reason for a lapse in qualification and subsequent termination. "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's . . . papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which,

---

[14]    Indeed, the Court notes that Chief Chawgo acknowledged that permitting Plaintiff a short time to resolve his insurance lapse would not have been a hardship on the Fire Department. (Dkt. No. 33, Attach. 18, at 84 [Chawgo Depo. Tr.].)

if believed, would show discrimination." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). When the Court considers the record as a whole, the Court finds Defendants' argument that Plaintiff was not qualified to be without merit.

      **c.**    **Whether Circumstances Exist that Give Rise to an Inference of Discrimination**

The Court finds that Plaintiff has provided sufficient evidence to establish that circumstances existed to give rise to an inference of discrimination. In addition to the analysis provided above in Part III.A.1.b. of this Decision and Order, the Court provides the following analysis. While Plaintiff's ALS certification was still valid, he requested to return to active status in a light duty capacity after being cleared by his physician. These requests were flatly denied and Defendants have failed to provide adequate evidence for failing to engage in the interactive process. *See*, *supra*, Part III.A.4. of this Decision and Order.

Defendants' argue that there is a lack of evidence supporting an inference of discrimination at least in part because they acted lawfully when imposing the IME requirement before returning Plaintiff to work. Plaintiff offers no evidence to dispute that ordering the IME was lawful. As a result, the Court finds the IME imposition lawful. However, Plaintiff argues that the chronology surrounding these events provides an additional inference of discriminatory animus. The Court agrees.

After Plaintiff had been cleared to return to light duty on April 22, 2018, by Dr. Duvinsky, Defendants then requested that Dr. Duvinsky provide them with Plaintiff's medical records in order to perform an IME. Although Dr. Duvinsky was initially hesitant to turn over Plaintiff's records to Defendants, he did so at the end of April at the direction of Plaintiff. (Dkt. No 37, Attach. 2, at ¶ 22 [Plf.'s Aff.].) However, Plaintiff's appointment with Dr. McIntyre was

scheduled for July 8, 2014. (Dkt. No. 37 at 5 [Plf.'s Opp'n Memo. of Law].)  Plaintiff's ALS

certification was set to expire at the end of July, and Defendants were in charge of setting up the

appointment with Dr. McIntyre.  Defendants argue that they did not schedule an appointment

with Dr. McIntyre sooner because of a delay in receiving the records.  In response to this

argument, Plaintiff asserts in his affidavit that, *after the end of April*, there was no substantial

delay in furnishing Defendants with the records.  (Dkt. No. 37, Attach. 2, at ¶ 22 [Plf.'s Aff.].)

Plaintiff argues that the following two-month delay in getting him an appointment with

Dr. McIntyre–coupled with the denial of his request to return to light duty–was purposefully

undertaken to ensure that his ALS qualification lapsed before Defendants cleared his return to

work.  Plaintiff also points to evidence that (1) Defendants never notified the Union when Dr.

McIntyre subsequently cleared him for duty and (2) Plaintiff would have been able to renew his

ALS certification before it expired if he had returned to work in May or June. (Dkt. No. 33,

Attach. 20 at 76, at ¶¶ 13-17 [Gray Depo. Tr.]; Dkt. No. 33, Attach. 18 at 60-61 [Chawgo Depo.

Tr.].)  When the Court considers the record as a whole, the Court finds that Plaintiff has adduced

sufficient evidence to support a reasonable inference of discrimination.

For the reasons described above, the Court finds that Plaintiff has made a satisfactory

prima facie showing for purposes of a motion for summary judgment.

### d.    Defendants' Burden and Plaintiff's Response

The Court now moves to the second and third steps of the *McDonnell-Douglas*

framework.  For the reasons cited in Defendants' memorandum of law, the Court finds that

Defendants have met their burden at step two of the *McDonnell-Douglas* framework. (Dkt. No.

33, Attach. 22 at 16 [Defs.' Memo. of Law].)  Defendants argue that Plaintiff's failure to meet

the qualifications required for the firefighter position at the time of his termination was the legitimate, non-discriminatory basis for his termination.  There is no dispute that Plaintiff's ALS certification had lapsed at the time that Plaintiff was due to return to work.  Evidence produced by Defendants clearly shows that an ALS certification was a requirement for employment as a firefighter in the City of Norwich.  (Dkt. No. 33, Attach. 12.)

The Court now moves to step three of *McDonnell-Douglas*.  Because Defendants have met their evidentiary burden in step two, Plaintiff must now demonstrate that Defendants' reason for their adverse decision was in fact a pretext for discrimination.  This may be demonstrated by reliance on the evidence that established Plaintiff's prima facie case, without any additional evidence being required, or by presentation of additional evidence to show that Defendants' reasons for his discharge were false.  *Gallo*, 22 F.3d at 1226.  Again, the discriminatory animus inferred in this case arises out of the circumstances surrounding Plaintiff's lapse in qualification.  In sum, Plaintiff points to the following circumstances: (1) Defendants delayed for two months in scheduling Plaintiff's appointment with Dr. McIntyre; (2) Defendants never notified the Union when Dr. McIntyre subsequently cleared him for duty; (3) Plaintiff would have been able to renew his ALS certification before it expired if he had returned to work in May or June; and (4) firefighters not afflicted with PTSD were allowed to re-certify when returning from medical leave after their certifications lapsed on at least two prior occasions.  For these reasons, the Court finds that Plaintiff has adduced sufficient circumstantial evidence for a rational fact-finder to conclude that Plaintiff has succeeded under this prong.

Accordingly, the Court finds that genuine issues of material fact exist as to whether Defendants discriminated against Plaintiff when terminating him; and Defendants' motion for summary judgment on this claim is therefore denied.

### 2.    Retaliation Claim

After carefully considering the matter, the Court grants Defendants' motion for summary judgment on Plaintiff's retaliation claim for the reasons stated in Defendants' memorandum of law.  *See, supra*, Part I.C.1. of this Decision and Order.  To those reasons, the Court adds only that Plaintiff has offered absolutely no admissible evidence supporting a causal connection between the union grievance filed as a result of Defendants' refusal to return Plaintiff to work in May and Defendants' decision to terminate his employment in October.

### 3.    Hostile Work Environment Claim

Based on the totality of the circumstances, the Court finds Plaintiff has failed to meet his burden in showing a hostile work environment for the reasons stated in Defendants' memorandum of law.  *See, supra*, Part I.C.1. of this Decision and Order.  The remarks and actions that Plaintiff complains about fall well short of the conditions necessary to establish an abusive work environment.  In support of his claim, Plaintiff points to a handful of isolated incidents, including the cleaning of his helmet at the direction of Chief Chawgo and the making of comments by Chief Chawgo to other firefighters outside Plaintiff's presence.  In fact, the admissible record evidence does not reveal *any* comments directed at Plaintiff that occurred in his presence.  Furthermore, Plaintiff failed to utilize the formal grievance procedure laid out by the collective bargaining agreement when attempting to rectify these issues.  (Dkt. No. 33, Attach. 17, at 108 [Plf.'s Depo. Tr.].)  Under the circumstances, these isolated incidents and the second-hand knowledge of alleged abusive acts do not meet the level of pervasiveness or severity required by hostile work environment claims.  For all of these reasons, Plaintiff's hostile work environment claim under the ADA is dismissed.

### 4.     Reasonable Accommodation Claim

The reasonable accommodation requested by Plaintiff was a return to light duty for a period of two weeks after being cleared to return by his medical treatment provider on April 22, 2014, followed by a return to full duty immediately thereafter.   As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because it was not possible to reasonably accommodate Plaintiff.  Based on the current record, the Court disagrees.

As previously discussed above in Part III.A.1. of this Decision and Order, Plaintiff meets the requirements of "disabled" under the ADA and accompanying EEOC regulations.  In addition, the parties do not dispute that Defendants had notice of Plaintiff's disability.  Both parties, through deposition transcripts and documentation, have adduced significant evidence that Chief Chawgo, Ms. DeForest, then-Mayor Maiurano, and the Common Council were aware of Plaintiff's condition throughout all relevant stages of his employment.

The Court notes that, in their memorandum of law, Defendants conflate Plaintiff's request for light duty on April 22, 2014, with Plaintiff's request to be allowed back on duty to complete his ALS re-certification at the meeting with city officials on October 22, 2014.  (*See generally* Dkt. No. 39 [Defs.' Reply Memo. of Law].)  Unlike the Court's finding above in Part III.A.1. of this Decision and Order, the Court finds that Plaintiff's ALS certification and driver's license were both valid at the time of his requested return to light duty for a period of two weeks on April 22, 2014. Plaintiff's ALS certification did not expire until July 31, 2014, and his driver's license was not suspended until September 27, 2014. The analysis thus centers on the remaining two elements of Plaintiff's prima facie showing for failure to reasonably accommodate.

33

### a.     Whether, with Reasonable Accommodation, Plaintiff Could Have Performed the Essential Functions of the Job at Issue

After carefully considering the matter, the Court finds that Plaintiff has made a sufficient showing that, with reasonable accommodation, he could have performed the essential functions of the job at issue.  Defendants argue that (1) allowing Plaintiff to return to work in a light duty status was not an available option in light of restrictions placed on manning and scheduling by the existing collective bargaining agreement (which permitted a maximum of four firefighters per 24-hour shift), and (2) other firefighters had expressed safety concerns should Plaintiff be required to respond to any emergency calls.  (*See generally* Dkt. No. 33, Attach. 18 [Chawgo's Depo. Tr.].)  However, the Court finds these arguments unpersuasive for two reasons.

First, the record indicates that the collective bargaining agreement in force at the time neither contains nor imposes a restriction on how many firefighters could be scheduled to work during any given shift or week.  Chief Chawgo himself stated that he was not aware of any restriction keeping him from using a fifth firefighter on any given shift, and the Court likewise finds no provision in the collective bargaining agreement that explicitly or implicitly imposed a maximum of four firefighters per shift.  (Dkt. No. 33, Attach. 18, at 55-56 [Chawgo's Depo. Tr.].)[15]  Defendants also argue that their reasons for refusing to accommodate Plaintiff's request for a 12-hour shift were rooted in safety concerns for Plaintiff and other firefighters.  However, Dr. Duvinsky made no representations to that effect in his report, and it is difficult to imagine

---

[15]     The Court notes that Plaintiff relies, in part, on Article 9, Section 9.7 of the collective bargaining agreement, which states that "[t]he Chief, at his discretion, may assign a Fire Assistant to work as a 5th person as needed to complete extra assignments." (Dkt. No. 33, Attach 2, at 9.)  However, this provision applies to Fire Assistants rather than Firefighters, and it is based on a "need[]."

that Dr. McIntyre would have cleared Plaintiff for duty in July if he harbored any concerns for Plaintiff's safety or that of the other firefighters.

Second, the record also indicates that, when Plaintiff was cleared for duty, Dr. Duvinsky expressed no specific concerns over any particular job functions Plaintiff may encounter while on duty. The Court recognizes that, while a light duty request necessarily suggests performance in a limited capacity, it is clear from the record that Dr. Duvinsky's request that Plaintiff perform a 12-hour shift instead of a 24-hour shift for the first two weeks was the extent of the limitation. (Dkt. No. 33, Attach 3.) In fact, Dr. Duvinsky made no request–and Defendants have not argued that he made a request–that Plaintiff refrain from the performance of any essential functions of his employment while on light duty. Mr. Gray also stated that the Fire Department has authorized light duty to returning firefighters in the past. (Dkt. No. 33, Attach 20, at 21-23 [Gray's Depo. Tr.].)

**b.    Whether Defendants Have Refused to Make Such Accommodations**

The record indicates that Defendants, upon receiving Plaintiff's request for return to work under limited duty for a period of two weeks, refused this request in or about late April, 2014. There is no evidence that the Chief Chawgo, Ms. DeForest, Mayor Maiurano, or the Common Council engaged in the interactive process envisioned by the EEOC. Although the interactive process is not a requirement where there is no possibility of the existence of reasonable accommodations, the Court is unable to find, based on the current record, that the requested accommodation was not possible.[16]

---

[16]    The Court notes that Defendants failed to properly assert any specific facts as to why they need not engage in the interactive process after April 22, 2014. Granted, Chief

As a result, genuine issues of fact remain as to whether Plaintiff's proposed accommodations after being cleared by Dr. Duvinsky for limited duty on April 22, 2014, were in fact reasonable.  Defendant's motion for summary judgment on this claim is therefore denied.

**B.     Claims Under the NYSHRL**

**1.     Discrimination Claim**

Because the legal standard governing both the federal and state discrimination claims are substantially similar, the Court need not recite its previous analysis with respect to Plaintiff's claims under the ADA.  The Court denies Defendants' motion regarding this claim for the reasons stated above in Part III.A.1. of this Decision and Order.

**2.     Retaliation Claim**

Because the legal standard governing both the federal and state retaliation claims are the same, the Court need not recite its previous analysis with respect to Plaintiff's claims under the ADA.  The Court grants Defendants' motion regarding this claim for the reasons stated in above Part III.A.2. of this Decision and Order.

**3.     Hostile Work Environment Claim**

Because the legal standard governing both the federal and state hostile work environment claims are the same, the Court need not recite its previous analysis with respect to Plaintiff's claims under the ADA.  The Court grants Defendants' motion regarding this claim for the reasons stated above in Part III.A.3. of this Decision and Order.

---

Chawgo points to "financial" issues; however, nowhere does any Defendant expound upon what those financial issues may have entailed.  Moreover, Chief Chawgo points to the fact that the Department surpassed its overtime budget in 2014 (due to Plaintiff's leave); however, he does not say the Department did so before late April of 2014.

### 4.     Reasonable Accommodation Claim

Because the legal standard governing both the federal and state reasonable

accommodation claims are substantially similar, the Court need not recite its previous analysis

with respect to Plaintiff's claims under the ADA.  The Court denies Defendants' motion

regarding this claim for the reasons stated above in Part III.A.4. of this Decision and Order.

### C.     Individual-Capacity Claims

After carefully considering the matter, the Court finds that there is no individual liability

pursuant to the ADA for the reasons stated in Defendant's memorandum of law.  *See Spiegel v.*

*Schulmann*, 604 F.3d 72, 79-80 (2d Cir. 2010) (holding that, in light of the remedial provisions

in Title VII, an interpretation of individual liability does not comport with Congress's clearly

expressed intent).  Plaintiff argues, however, that Ms. DeForest and Chief Chawgo have the

capacity to be held individually liable under the NYSHRL under both the ownership theory of

liability and the aiding-and-abetting theory of liability. (Dkt. No. 37 at 21 [Plf.'s Opp'n Memo.

of Law].)

Under the NYSHRL, individuals may be held liable if they have an ownership interest in

the employer or the authority to hire and fire employees.  *Magnotti v. Crossroads Healthcare*

*Mgmt. LLC*, 14-CV-6679, 2016 U.S. Dist. LEXIS 69929 at *5-6 (E.D.N.Y. May 27, 2016). "If a

plaintiff proves that the 'individual had the ability to do more than carry out personnel decisions,

including the power to hire and fire employees and supervise and control employee conditions of

employment,' he need not prove 'that this individual actually used such powers [against] the

plaintiff.'" *Magnotti*, 2016 U.S. Dist. LEXIS 69929, at *5-6 (quoting *Scalera v. Electrograph*

*Sys., Inc.*, 848 F. Supp. 2d 352, 373 (E.D.N.Y. 2012)).  In the present case, the record clearly

indicates that complete termination authority rested with the Mayor and Common Council. (Dkt. No. 33, Attach. 10.)  As a result, Chief Chawgo and Ms. DeForest cannot be held liable under this theory of liability.

Under the aiding-and-abetting theory of liability, "an individual employee need not himself take part in the primary violation[;] [he need only] aid, abet, incite, coerce or compel, a primary violation of the HRL committed by another employee or the business itself." *Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 380-81 (S.D.N.Y. 1999).  Plaintiff argues that Chief Chawgo and Ms. Deforest were crucial in providing information to, and advising, the Mayor and Common Council regarding the status of city employees.  Based on the current record, a rational fact-finder could conclude that these two individuals incited and/or abetted the denial of Plaintiff's request for light duty accommodation and his ultimate termination.  Chief Chawgo was Plaintiff's direct supervisor, was informed about Plaintiff's condition on an on-going basis, and participated in multiple meetings and correspondence with the Mayor and Common Council regarding Plaintiff's initial request for medical leave and his requested return.  In addition to the above points, Ms. Deforest was also instrumental in organizing Plaintiff's appointment with Dr. McIntyre and participated in several meetings with the Mayor and Common Council regarding Plaintiff's employment status.  As a result, based on the current record, the Court finds that a rational fact-finder could conclude that Chief Chawgo and Ms. DeForest are individually liable under the NYSHRL under an aiding-and-abetting theory of liability.

### D.    Plaintiff's Claims for Back Pay and Front Pay

After carefully considering the matter, the Court dismisses Plaintiff's claims for back pay and front pay.  Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standard governing Plaintiff's claim in this action, the Court will not recite, in its entirety, that legal standard in this Decision and Order, which is intended primarily for review by the parties.  (*See generally* Dkt. No. 33, Attach. 22 at 22-25 [Defs.' Memo. of Law]; Dkt. No. 37, at 22-23 [Plf.'s  Opp'n Memo. of Law].)  In the present case, Defendants correctly point out that Plaintiff, after being terminated in October 2014, made no efforts whatsoever to seek employment until April 2015. (Dkt. No. 33, Attach. 17 at 109, at ¶¶ 12-22 [Prindle Depo. Tr.].)  Moreover, the Court finds that Defendants have adduced sufficient evidence that Plaintiff has made no efforts to seek comparable employment as an EMT or firefighter at any point following his termination.  (Dkt. No. 33, Attach. 17 at 111, at ¶¶ 6-9 [Prindle Depo. Tr.].)  As a result, Plaintiff's claims for back pay and front pay are dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 33) is **GRANTED** **in part** and **DENIED** **in part** as follows:

1.    Plaintiff's discrimination claim under the ADA **SURVIVES** Defendants' motion;

2.    Plaintiff's reasonable-accommodation claim under the ADA **SURVIVES** Defendants' motion;

3.    Plaintiff's discrimination claim under the NYSHRL **SURVIVES** Defendants' motion;

39

4.      Plaintiff's reasonable-accommodation claim under the NYSHRL **SURVIVES** Defendants' motion;

5.      All of Plaintiffs individual liability claims against Defendants Chawgo and DeForest are **DISMISSED except for** those individual liability claims under the NYSHRL described above;

6.      Plaintiff's retaliation claim under the ADA is **DISMISSED**;

7.      Plaintiff's hostile work environment claim under the ADA is **DISMISSED**;

8.      Plaintiff's retaliation claim under the NYSHRL is **DISMISSED**;

9.      Plaintiff's hostile work environment claim under the NYSHRL is **DISMISSED**;

10.     Plaintiff's claims for back pay and front pay are **DISMISSED**; and it is further

**ORDERED** that counsel are directed to appear on **MAY 3, 2018** at 11:00 a.m. in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **APRIL 13, 2018**, and the parties are directed to engage in meaningful settlement negotiations prior to the   conference.

Dated:        March 27, 2018
              Syracuse, NY

                                        Hon. Glenn T. Suddaby
                                        Chief U.S. District Judge